[No. 25153. Department One. July 23, 1934.]

THE STATE OF WASHINGTON, *Respondent*, v. E. T. MARTIN, *Appellant*.[1]

[1]Reported in 34 P. (2d) 914.

*Geo. H. Crandall,* for appellant.

*Robert M. Burgunder* and *John F. Walthew,* for respondent.

MILLARD, J.—By the first count of an information, a physician and a nurse were charged with the crime of manslaughter, in that defendants' use and employment of instruments and other means, with intent thereby to procure the miscarriage of a named woman, the same not being necessary to preserve her life, produced the death of the woman. The pertinent statute reads as follows:

"Every person who shall provide, supply or administer to a woman whether pregnant or not, or shall prescribe for or advise or procure a woman to take any medicine, drug or substance, or shall use or employ, or cause to be used or employed, any instrument or other means, with intent thereby to procure the miscarriage of a woman, unless the same is necessary to preserve her life, in case the death of the woman . . . is thereby produced, shall be guilty of manslaughter." Rem. Rev. Stat., § 2397.

By the second count of the information, the same defendants were charged with the crime of abortion (the same woman was the named victim in each count), in violation of the statute which provides that

"Every person who, with intent thereby to produce the miscarriage of a woman, unless the same is necessary to preserve her. life or that of the child whereof she is pregnant, shall . . .

"Use, or cause to be used, any instrument or other means;

"Shall be guilty of abortion." Rem. Rev. Stat., § 2448.

The trial resulted in acquittal of the nurse and verdict of guilty as to the physician on both counts. From the judgment and sentence pronounced in accordance with the verdict, the physician prosecutes this appeal.

■ Citing *State v. Powers,* 155 Wash. 63, 283 Pac. 439, as sustaining authority, appellant insists that the irrigating curettement, an operation performed with a surgical instrument for the purpose of emptying the uterus, was necessitated by the presence of infection; and that the state did not sustain the burden of proving that the operation performed by him was not necessary to save the patient's life.

In *State v. Powers, supra,* we said that, according to the medical testimony offered by the appellant, a curettement is recognized as proper where there was flowing, increased temperature and accelerated pulse, for the reason that infection would be indicated. We held that, under the statute (Rem. Rev. Stat., § 2448), it was necessary for the state to prove that the curettement of the prosecuting witness in that case was not necessary to preserve her life, and said:

"If the appellant, in performing the operation, did something which was recognized and approved by those reasonably skilled in his profession practicing in the same community with him and the same line of practice, then it cannot be said that the operation was not necessary to preserve the life of the patient. That circumstantial evidence is competent to prove the absence of a necessity for an operation in order to preserve a woman's life, is amply supported by authority."

The burden was imposed upon, and sustained by, the state to prove that the curettement was not necessary to preserve the life of the patient. If, in the case at bar, the evidence adduced by the state is true (the jury had a right to believe it, and their verdict reflects

acceptance thereof as true and the rejection of the testimony of appellant and his co-defendant as untrue), that evidence is sufficient to show non-necessity of the curettement to save the woman's life. The facts are summarized as follows:

In February, 1933, an unmarried woman, twenty-two years old and apparently in good health, discovered that she was pregnant. She so informed her lover, who obtained for her an emmenagogue in the form of pills. These failed to renew the menstrual flow. In March, 1933, her lover procured for her a drug known as duray. Part of this was taken by the woman in March, and the remainder of it about April 3rd or 4th. It, likewise, was of no aid in bringing on the menstrual flow. During all of this time the woman was employed as a clerk in a store. Members of her family and a fellow employee, none of whom knew that she was pregnant, and her lover, testified that her physical condition, appearance and demeanor were unchanged during the period of pregnancy. Between April 7th and 10th, she had a slight attack of headache and indigestion, but there is no other record of indisposition.

On April 8th, on advice of a physician, she went to the nursing home of appellant's co-defendant. The latter, on inquiry of the woman and her lover, gave the names of appellant and another physician who would take care of the case. On Tuesday, April 11th, the woman's lover called at the office of appellant and informed him as to the woman's condition. The appellant advised his caller to bring the woman to appellant's office the next morning, April 12th, for examination. This was done. The woman was in appellant's private office approximately thirty minutes. Only the appellant could testify concerning what there oc-

curred and what was said; the victim's lips were sealed by death.

After the woman's departure from his private office, appellant informed the woman's lover that the entire cost until Saturday night, including the nursing home charges and the appellant's fee, would be seventy-five dollars, and directed him to take the woman to the nursing home of appellant's co-defendant, which was done that afternoon. Two days later, Friday, April 14th, the appellant performed the curettement operation and removed the fetus of a child. Appellant's co-defendant testified that the nature of the operation was not disclosed to her; that

"I understood he was going to use a hot antiseptic wash. I didn't understand he was going to remove the fetus of a child. I would not have permitted Dr. Martin to remove the fetus of a child without calling in another physician to certify or find the necessity of it. Dr. Martin did not tell me what he was doing. . . . If I knew that the girl had been pregnant and there was a fetus in the uterus, and there was to have been a curettement, I would have insisted on calling another doctor before I allowed a curettement to be done in my place."

Following the operation, the patient's condition became critical. Appellant no longer attended the woman, because, so he testified, of his physical condition. He caused Dr. Templeton to be called to care for the patient. The following Wednesday, April 19, 1933, exactly one week subsequent to the time she called on appellant for advice, the patient was removed, on advice of Dr. Templeton, from the nursing home to the Virginia Mason hospital, where she died the next morning.

There was testimony that appellant and his co-defendant advised the deceased's lover to testify, in the event of an inquest and prosecution, that the de-

ceased had excessive cramps, had sustained a fall and had excessive flowing. The testimony of the deceased's relatives and lover was that, the day before and the day the deceased called at appellant's office, there was nothing indicative of a rise in temperature or flushing; that they never knew that the deceased had ever sustained a fall. The woman's lover met no objection on the part of appellant when he approached the appellant in the matter of having the illegal operation performed on his sweetheart, who was in good health and three months advanced in pregnancy.

Appellant's narration, corroborated in part by his co-defendant, was that, when the woman called at his office, she had accelerated pulse, a rise in temperature and was flowing. He made a thorough examination of the woman after she gave to him a history of the case. She informed him she had missed three menstrual periods, had taken emmenagogues and used appliances to renew the menstrual flow, and that she sustained a fall and had a chronic condition of the bowels from which she had suffered all of her life. He advised hospitalization. She demurred, fearful of the publicity incident to being in a hospital. Thereupon, arrangements were effected for treatment in the private sanitarium of his co-defendant. He further testified that she flowed continuously from the time (Wednesday, April 12th) she called at his office until Friday, April 14th, when her uterus was evacuated; that continued rise in temperature, accelerated pulse and flowing indicated a condition necessitating the operation performed by him. His testimony as to accelerated pulse, rise in temperature and flowing while in the private sanitarium was corroborated by his co-defendant.

True, the deceased tried to commit an abortion. It likewise clearly appears that her attempts were un-

successful, and that she started out to find, and did find, a physician who would perform the operation. There is ample competent evidence that appellant operated on a healthy woman, at her request, to procure an abortion, and that she died in consequence thereof. The inference is irresistible, and we are convinced, as was the jury, that the operation was not necessary to preserve the life of the mother.

■ Appellant assigns as error the giving of the italicized portion of the following instruction:

*"You are instructed that it is not necessary for the state to prove to you that . . .* [name of woman] *actually was pregnant.* It is sufficient if you are convinced by the evidence in this case beyond a reasonable doubt that the defendants, at the time and place alleged in the information, used or caused to be used upon the said . . . [name of woman] any instruments or other means with intent to produce the miscarriage of the said . . . [name of woman], and that the same was not then and there necessary to preserve the life of . . . [name of woman]."

The assignment is without merit. The statute (Rem. Rev. Stat., § 2397) on which the charge of manslaughter is bottomed does not require that the crime shall be committed upon a "pregnant" woman. Under the statute defining the crime, pregnancy is not a material fact to be proved or found by the jury unless the defendant is charged with the death of a quick child. The crime with which appellant was charged could have been committed even though his patient were not pregnant.

"It is enough in such a case that the defendant, believing her to be in such condition, used instruments with the unlawful intent to produce a miscarriage, and that she died as a result of the injuries thus inflicted." *State v. Snyder,* 188 Iowa 1150, 177 N. W. 77, 10 A. L. R. 309.

To the same effect is *State v. Bickel*, 177 S. W. (Mo.) 310. It was there held, on a trial for homicide charged with having resulted from an abortion, that it is immaterial whether the woman was actually pregnant or not, under a statute which provides that

" . . . any person who, with intent to produce or promote a miscarriage or abortion, advises, gives, sells or administers to a woman (whether actually pregnant or not), or who, with such intent, procures or causes her to take, any drug, medicine, or article or uses upon her, or advises to or for her the use of, any instrument, or other method or device to produce a miscarriage or abortion (unless the same is necessary to preserve her life or that of an unborn child, or if such person is not a duly licensed physician, unless the said act has been advised by a duly licensed physician to be necessary for such a purpose), shall, in event of the death of said woman, or any quick child, whereof she may be pregnant, being thereby occasioned, upon conviction be adjudged guilty of manslaughter in the second degree, and punished accordingly."

Under our statute, Rem. Rev. Stat., § 2397, one who, believing her to be pregnant, uses instruments or other means upon a woman for the purpose of producing an abortion, or induces the woman to use an instrument or other means for such purpose, is guilty of manslaughter if she die as the result of such operation, even though the woman is not, in fact, pregnant.

Two other assignments respecting certain questions asked by the prosecutor, to which objections were sustained by the court, are without substantial merit.

Our examination of the record failing to disclose reversible error, the judgment is affirmed.

BEALS, C. J., MAIN, MITCHELL, and STEINERT, JJ., concur.